We'll call our next case, Brathwaite v. Warden. Mr. Kerner. You may proceed. Thank you. May it please the Court, I'm Justin Kerner and I represent the appellant, Kevin Brathwaite. May I please reserve three minutes for rebuttal, Your Honor? Yes, Your Honor. Thank you. This case does not concern Mr. Brathwaite's crimes or his sentence, but rather the deprivation of his rights under the 14th and 8th Amendments to the U.S. Constitution while incarcerated at the James T. Vaughan Correctional Center in Smyrna, Delaware. The District Court committed reversible error in at least three ways that I'd like to address this morning. First, by relying on the wrong precedent, ignoring the correct body of binding precedent, and failing to recognize that Mr. Brathwaite had a protected liberty interest in his long-term and indefinite incarceration in the prison shoe, which should have given rise to procedural due process. Let me ask you, at one point I read that he was in his cell 23 hours a day and out for one hour a day. Is that the normal confinement in the shoe, do you know? Yes, Your Honor. Per the prison's own website, inmates confined in the shoe are confined to their cells for 23 hours a day. Just before you go on real quickly, the current state of affairs, where's Mr. Brathwaite? He's been transferred out of the James T. Vaughan Correctional Center to Camp Hill and then again to Chester. Okay, not in segregation or anything like that? I'm not sure what assignment he has within the Chester facility, Your Honor. But the claim relates to the James T. Vaughan segregated housing? That's exactly correct, yes. Thanks. The second point I'd like to address this morning is that the District Court committed reversible error by concluding that Mr. Brathwaite needed expert testimony to present any portion of his deliberate indifference claim. And then third, assuming that expert testimony were necessary to present that claim, which it was not, then the District Court again committed reversible error by failing to appoint pro bono counsel to assist Mr. Brathwaite either before or during the summary judgment proceedings. Okay. To go back to your first point, what you're really arguing is that the judge was simply wrong in flatly stating that there could never be a liberty interest. Yes, that's exactly right. You're relying on Standen, I assume, for that proposition. Yes, Your Honor. I agree with you. So the next showing is whether his conditions of confinement reflect an atypical hardship. The duration and conditions, that's correct. And I assume that means an atypical hardship in prisons generally in the United States, not necessarily just prisons in Delaware or wherever. That's right. Under Schultz, Your Honor, this circuit has found that it should be conditions atypical as compared to the conditions in the general population of the prison. What about Williams? In what respect, Your Honor? Well, in that solitary confinement or confinement to yourself 23 hours a day is a denial of a liberty interest if extended for a long period of time without periodic review of the necessity for such confinement. Yes, Your Honor. I understand. Thank you. The first factor, of course, in determining whether Mr. Brathwaite had a protected liberty interest is the duration of his confinement. And here I don't believe that anyone can test that eight years without any sort of end date in sight is a sufficient duration. The second factor, of course, would be the conditions. And Williams makes clear, I believe as a matter of law, that prolonged confinement in mere solitary conditions are sufficient to give rise to a protected liberty interest. Does it matter if the prisoner himself or herself declines opportunities to be out of the cell? I mean, is there record evidence here that there was – what's the record here about what his interaction with the prison was in that regard? The record, of course, with respect to this claim are the pleadings because we're here on a dismissal for frivolousness. Mr. Brathwaite pleaded that he was confined in his cell for the bulk of the day and that for the limited period in which he could leave, he chose not to for reasons unrelated to his due process claim, related to pain and inability to travel. Okay. That's the point I'm trying to ask. Does that make a difference? Legally, does it make a difference that when he had an opportunity he said, no, I'm not leaving? I don't believe so, Your Honor. Because? Because under Williams, which discussed solitary or near solitary confinement, placing an inmate in near solitary confinement for a prolonged and indefinite period gives rise to a protected liberty interest. Here, regardless of what decision Mr. Brathwaite made with the remaining hour of his day, the prison had restricted his movement and restricted his social activities for the bulk of his day, for 23 hours a day. So extensive that it doesn't make any difference. Yes, Your Honor. Okay. Is it really if you're looking for a remand to develop the record  With respect to this claim, yes, Your Honor. That's what I thought. Turning to the medical claims for a moment, if we could, Mr. Kern. And taking off the table the argument about he should have pro bono counsel, we can get to that. But just looking at the circumstances that the judge was looking at, the record that the judge had on the medical issues, why was the district court incorrect in saying, look, if you want to complain about pain in your shoulder, you have to have somebody in here to come and explain to us that this is a serious medical need. We can't just take your word for it, or we'd be having to take every prisoner's word for it when they said, when I tell him my throat hurts, it really, really hurts. This is a serious medical need. We've got to have somebody come talk to us. What's error in that reasoning? I don't believe there's error, Your Honor, in requiring a prisoner to come forward with some objective evidence. But under the Boring case, that's B-O-R-I-N-G, a prisoner meets that burden, even with a lack of expert testimony, by showing that he suffered from a medical condition that was diagnosed by a physician or medical professional and that a treatment regimen was ordered or recommended by that professional. Well, here's a record about that, the double cuffing claim, for example, the pain in the shoulder and I have to have double cuffing. There was competing evidence in the record, right? Yes, Your Honor. Okay. So if there's competing evidence in the record, isn't that a sound basis on which the district court could say, as a matter of summary judgment, look, you haven't made a claim that there's a serious medical need here that they're being blind to and ignoring? No, Your Honor. With respect to that specific aspect of the claim, upon the first motion for summary judgment filed by the medical defendants, the court found conflicting evidence, and based on the conflicting evidence said, this is not a decision that should be made at the summary judgment stage. Conflicting evidence should be given to the jury. It's not a question where Mr. Brathwaite failed to come forward with any competent evidence. He came forward with evidence to show seriousness, just not evidence that was agreed upon by all parties. Yeah, as soon as you say not evidence that was agreed upon by all parties, there was how do you get to a fact question here?  There was no factual disagreement that there was competing medical evidence that the prison had in front of it. Everybody agrees to that, right? As a matter of historical fact, there was a period of time where somebody said he ought to have double cuffing, and then somebody else came in and said that's not really necessary, right? That's not in dispute that those things are in the record? Correct, Your Honor. Okay. So if those things are in the record, it's not like we're asking the court to sort out which of those pieces of evidence is better. Isn't the question before the court at that point, has the prison got a basis on which it could make the decision it made, even if somebody else could disagree with it? Your Honor, I believe at that point we're asking a different question. Indeed, we are. That's my point. Aren't you asking us to ask a different question than the one the district court asked and rightly answered? No, Your Honor. If I can take just a moment to explain. There are two separate questions here that the court considered with respect to expert testimony. First was whether Mr. Brackway needed expert testimony to show the seriousness of his underlying medical condition. And second, whether Mr. Brackway needed expert testimony to show that the medical defendants were deliberately indifferent to those medical conditions. Because Mr. Brackway demonstrated by reference to medical diagnoses and treatment orders that he had a degenerative shoulder condition, he did not need expert testimony to show a serious medical condition. The second question, whether he needed expert testimony to show deliberate indifference, comes back to the piercing case. Here, this isn't a question of adequacy. It's the outright denial or delay in treatment. And because questions of delay or denial are subjective by nature and come down to scienter or intent or really credibility, the courts do not require expert testimony in those circumstances. The question I'm trying to ask, and perhaps doing it inartfully, is wasn't it incumbent on your client to show on that second point that there was some evidence of scienter? In other words, doesn't the second question swamp the first? You're pointing to the first and saying the district court erred there. But even if you were right, why does it matter? It doesn't matter, does it, if there's no evidence of scienter or willful blindness to a serious medical need? Because if they've got evidence in the record that shows we don't think it is necessary, that they could reasonably rely on in that game-up on that double-cuffing claim. With respect to the double-cuffing claim, Your Honor, if there were sufficient evidence of record to show that the medical defendants had a valid medical reason for failing to renew the memorandum, then yes, it would defeat that one aspect of the deliberate indifference claim. But the record taken as a whole shows that the medical defendants were deliberately indifferent to a host of Mr. Brathwaite's medical needs without valid medical reason. And I believe a reasonable juror can conclude, in light of the totality of the evidence, that that was but one example of deliberate indifference. Let me ask you at this point, could you infer deliberate indifference from retaliatory actions taken by the prison authorities, at least in two instances, refusing to give medication that had been pre-approved or not allowing a prisoner to see what he was being told to take? Couldn't you argue that those had nothing to do with medical conditions whatsoever? They were simply retaliatory actions, and that alone would be enough to make out deliberate indifference? Yes, Your Honor, that's exactly correct. I'm surprised you would agree with me. Softball's coming through. The remaining claim for reversible error here was the district court's failure to appoint counsel. I see that I'm running short on time, so I'll be very quick if I may have that indulgence. Go ahead. We'll give you a few seconds. We've got your argument. We've read it. We understand it. I would just like to note the medical defendants have raised the issue of waiver in their briefs, and I would point to the court that this case is remarkably similar to Montgomery, a case in which Judge Roth sat on the panel and found that the district court committed reversible error when the pro se indigent inmate requested pro bono counsel at the beginning of the proceedings but did not request counsel during summary judgment proceedings, and summary judgment was entered against him. Okay. Thank you very much, Mr. Kerner, and I should mention on the record we appreciate you and DLA Piper taking the case as a pro bono matter to assist the court and Mr. Braithwaite. Thanks very much. It's my utmost honor. Thank you. All right. We'll hear now from counsel for the appellees. We're going to have the prison defendants first. Mr. Hanlon. Good morning, Your Honors. Joe Hanlon from Department of Justice in Delaware on behalf of appellees Phelps, Pierce, Scarborough, Kemp, and Savage, and initially I want to apologize to the court for the confusing nature of some of the filings in this case from the state side. Okay. Let's jump right in. For sake of ease, we'll just call your set of clients the prison defendants, if that's okay, and the clients that are represented on the medical side issues, so Mr. Griffith's clients, the medical defendants, if that's all right with you. Yes, Your Honor. I think a clarification should be added to that, that there were three other DOC defendants in the case that are not at issue on appeal, and that's Kline and Furman and Harkins, and they had to do an excessive force claim that's not at issue on appeal. The five that I mentioned, the prison defendants, as Your Honor, as defined then relate to the conditions of confinement with respect to the shoe, nearly seven years' stay. All right. Understanding that, just please, does the state recognize that indeed there is a liberty interest in not being confined in segregated housing if the conditions are atypical, when there's no opportunity for review? Yes, Your Honor. If there's a significant atypical hardship for a certain length of time, that length changes depending on... And we're obligated to be looking at this not on the basis of a summary judgment standard, as the briefing argued from the state, right? Because it wasn't a summary judgment. Correct, Your Honor. That's one of the reasons I apologize. Yeah. So how is Mr. Kerner incorrect in saying Sandin, Schultz, Williams, they all undermine the state's argument here? Well, Your Honor, I'd be hard-pressed to quibble with the duration. Six years, I think, under Schultz is close enough to Schultz and exceeds Young, Griffin, and Torres' decisions of this court, where the court found periods as great as 930 days as not implicating due process. It's closer to Schultz. It's a significant period of time. But I think what is critical, and I think the court really should look to Judge Sleet's screening decision in a context. If you look at the complaint, and even the amended complaint, Mr. Brathwaite spent an inordinate amount of time on many other claims other than the Shue claim. The Shue claim is a page and a half. I don't see allegations in the complaint about the conditions of Shue. He just says, I was put in Shue, I've been in Shue for six and a half years, and I've received no meaningful review. Doesn't the state's own 28J letter indicate to us that there are serious issues in that regard? I saw the 28J letter, the one from December 21st, that talked about how conditions in the Shue have changed. I mean, isn't the implication of that that, yeah, it's gotten better. It was worse before. Yes, your honor. The out-of-cell time is significantly changed. For the last year and a half, the state has been obligated pursuant to a district court order to provide or to offer 17 and a half hours out-of-cell time. I will not stand here and tell you that the conditions, in particular out-of-cell time, were significant back in 2004 to 2010. However, if we take that, and just the naming of it, the secure housing unit, isn't it, if we read the allegations in the complaint in the light most favorable to Mr. Braithwaite, isn't that enough to get past a dismissal for frivolousness? To say, you're in segregated housing. That implies that you are not enjoying what freedoms there may be in the general population. And that is atypical. You're in there for a reason. We're making it atypical for you. Isn't that all by itself enough to get past the frivolousness screen? Well, your honor, I believe justly, and I know courts have said it's the same standard, but it has failed to state a claim. Because Mr. Braithwaite said nothing about his conditions. We're sitting here, you know, appellate's counsel cites the Pennsylvania case as true conditions to guide the court on what Mr. Braithwaite's conditions should have been. I would point out that, and this is not in our brief, but there is an allegation in the complaint about Mr. Braithwaite losing his prison job that he had for two years as a tier man. These are the pleadings that Judge Slade had to look at in 2010, eight years ago. And this is by a pro se litigant. Correct. A little leeway in interpreting what he's talking about. Yes, your honor. Leeway in how a pro se inmate can craft pleadings. These are basic facts of his condition of confinement that we see alleged by inmates on a daily basis. I think it's only fair to assess Judge Slade's screening decision in a context, and he's looking at this complaint. And I don't see anywhere in there about his out-of-cell time. All I see is that he had a prison job for two years during this period. And that he was in the shoe. He was in the shoe. I just don't know. So. So that you're in the shoe without a meaningful review, which acknowledges a review, your honor. There are allegations in his complaint, in his medical complaint, about a 90-day quality of life review that he's receiving, and a review, and he takes issue with it not being meaningful. And he doesn't explain it at all, and he concentrates all of his medical claims. We've got to look at this. I'll repeat. We're obligated to look at it in the light most favorable to Mr. Braithwaite, and with the additional benefit of, at the time, him being a pro se plaintiff, who had been, in fact, denied referral to counsel by the court, right? Doesn't that all have to play into the perspective we bring to the kinds of allegations that he makes about being in the shoe? Yes, your honor. Okay. But I believe the court, when you're assessing Judge Sleet's screening decision, should look at the decision in the context and look at the actual pleading. And I feel that in order to reverse Judge Sleet on his decision ten years ago, there ought to be some consideration to the fact that Mr. Braithwaite, who seems very articulate, who has shown in the record that he doesn't hesitate to file many injunctive relief motions and other motions and zealously advocate for himself, his complete lack of facts. Would it at least argue Mr. Hanlon for giving him a chance to amend his complaint instead of just pitching it as? Well, Mitchell v. Horne, the court did exactly that. It was a screening decision, and I believe that was an appeal that immediately followed the screening decision. And I don't know if that's directly relevant to the issue before this court, but this is a case that was filed in 2010. Mr. Braithwaite had an ability to amend the complaint throughout the years and actually did add other claims. Okay. I think the court should also consider the fact that shortly before the complaint was filed, the Supreme Court did issue Iqbal, which required facts to be pled, not necessarily extremely articulate facts from a pro se party that the party should be able to plead facts. And here there are many inmate cases, pro se inmate cases, where inmates are not privy to the information that they need to explore their claims and maybe state claims as eloquently as the courts would like. But here this is something that's uniquely in the capability of an inmate to plead, which is how much time they're getting out of cell, what they're doing. The only thing that Mr. Braithwaite pled was that he had a job for two years during this period. And he did not seek injunctive relief in his complaint or his amending complaint, which maybe is just because of his pro se nature, but he sought damages. The conditions in jail are significantly different today. Mr. Braithwaite is not in Pennsylvania anymore, and I believe the Williams decision, Your Honor, is a strong authority for the fact that these five defendants would likely have qualified immunity if the case was remanded. Wouldn't there be some value, though, in fleshing out the record of conditions today or how they've evolved over time simply as a prophylactic against future lawsuits brought by prisoners like this one? I believe it would be a great use of resources given the evolution of the Supreme Court's precedent in qualified immunity given the Williams decision. How can we even look at the qualified immunity point? It wasn't raised. I didn't, Your Honor. Okay. I thought the question kind of... All right. Understood. ...took that kind of answer out of me. Okay. The efficacy of a remand at this point. All right. Thank you, Your Honor. Thank you, Mr. Hanlon. Mr. Griffith. Good morning. May it please the Court, Dan Griffith on behalf of the medical defendants. If it's okay with Your Honors, I'd like to first address what I believe is a central issue with respect to the medical defendants, which is whether or not it was appropriate for the district court to require expert testimony to support plaintiffs' remaining two 1983 claims, which were relating to a shoulder injury and whether or not he needed to be double cuffed, and then number two, whether or not it was deliberate indifference to a serious medical need to not crush Mr. Brathwaite's pills in front of him and rather administer the pills to him in their crushed form. Mr. Kramer correctly mentioned that the correct standard is the Boren case. We agree on that. And, in fact, the district court relied upon the Boren case, cited it in its opinion in determining that expert testimony was, in fact, required to support those two claims. And as Your Honor mentioned earlier, one of the reasons why expert testimony was required was because there was medical evidence that supported the medical defendants' decisions on those cases. Can I take you a little off this point for something that has been troubling me, and that is the district court denies referral to counsel under TABRON and then dismisses or grants summary judgment, I should say, on the claims for lack of medical expert evidence. Now, how in light of cases like Montgomery and Parham can that be? How can it be at one and the same time that you say to somebody incarcerated, you don't need a lawyer, and then say all your claims are dismissed because you don't have a medical expert when that seems to imply a level of complexity and, indeed, a level of capacity to operate that prisoners, particularly prisoners in a SHU, don't have? Thank you, Your Honor. A couple of things on that. Mr. Brathwaite made one application for the appointment of counsel in 2011. The events we're talking about were 2015. During that intervening period, Mr. Brathwaite filed a total of 26 motions on his own behalf, five of which were for emergency adjunctive relief. Mr. Brathwaite had demonstrated the ability to represent himself very competently to that point. In certain regards, but that doesn't mean that he knows how to get an expert witness. He knows who to contact about getting an expert witness. He understands what an expert witness is needed for. I think I agree, Your Honor. Procedurally, what happened was after the defendants, both defendants, had filed their first motions for summary judgment, at least the medical defendants wrote to the court and to Mr. Brathwaite and put both the court and Mr. Brathwaite on notice of the notion that the medical defendants believed  And we intended, after a period of discovery, to remove for summary judgment on that basis. So at that point, both the court and Mr. Brathwaite were on notice that our position was going to be somewhere down the line that expert testimony was necessary. And I think the court even mentioned in its subsequent orders No, go ahead. Let me just somewhat rephrase that. I've been in the business of reviewing these similar complaints for 24 years. Do you ever know of an instance where a pro se prisoner was actually went out and hired expert medical testimony without the assistance of counsel? Yes and no. On occasion, in Mr. Brathwaite's case, these prisoners get referred out to doctors that have contracted with the prison medical provider. And, for instance, in Mr. Brathwaite's case, he was referred to a Dr. Dushutle in Dover. And, in my experience, when they have an expert, they retain the treating physician. They talk to their treating physician and say, Hey, I have this lawsuit pending against the medical provider. And these doctors have an ethical obligation to support their patients. And so prisoners have, although they haven't gone out of pocket, to my knowledge, to do that, they have had their treating physician serve as their experts in these cases. And Mr. Brathwaite had that ability. The medical defendant's position is that when the district court gave the medical defendants a second bite at the apple, let them refile and get another run at summary judgment, that it was on the pro se prisoner to understand I better ask for counsel again and I better say I need help getting a medical expert because if he didn't himself aggressively do that, he's out of luck. I don't know how to phrase it that way, Your Honor. Well, I'm sure you wouldn't have phrased it that way. But I'm trying to put it as starkly as possible because that's how it's coming out. It's that, hey, if you're looking at this, you can maybe appreciate from Mr. Brathwaite's perspective that it looks like the district court's given the benefit to the represented sophisticated parties here, letting them get another crack at summary judgment, and then saying to the prisoner, well, hey, no medical evidence, you're out of luck, even though you're in jail, indeed in restricted housing. Why didn't you show up in court with the right kind of expert evidence? I understand that, Your Honor. Unfortunately, the flip side of that is so many of these cases, these deliberate indifference cases, require expert testimony. So many of them do. And if the court's obligation were a deliberate indifference case required expert testimony, was to appoint counsel in all those cases, I think that would be a very difficult burden. But are these cases you're talking about cases in which a diagnosis has been made and treatment not provided, or in cases which need a diagnosis in the first place? Both, Your Honor. Well, I mean, there's a big difference, isn't there? Well, in terms of when an expert is necessary, I think if there's been a complete denial of claim, if there's been a diagnosis and an ordered course of treatment, and that treatment hasn't been provided, then I don't think there is an expert. Okay. So the crushed pills, the prison told the medical people that because he, Mr. Brathwaite, had received the wrong medication on one instance, that he should have the opportunity to see the pills before they were crushed. And they stopped doing that. I think it's difficult to assume that they stopped doing that and still found that an expert was necessary because... Why? Because the prison had ordered the medical people not to crush the pills until... to crush the pills in the presence of the prisoner. The prison didn't order them to do that. Well, that's my understanding from the briefs. That was the argument that was made. There's nothing in the record that says the prison ordered them to do it. What happened was the prison said, we'll speak to management, meaning prison management, about educating the staff, meaning medical staff, about crushing pills in front of the inmate. What's important about that, Your Honor, is that in terms of the necessity of an expert, is the medical treatment was being provided to the inmate. The pills were being given to the inmate. It wasn't being given in the form that the inmate wanted or that the prison may or may not have directed. If treatment is provided, treatment was provided, the question was whether it was in the right form. And in those situations, the district court found, if you're providing the treatment but it's not necessarily in the form, there's a dispute over whether the form is appropriate, then you need an expert to determine that that's deliberate indifference to a serious medical need, that a lay jury can't determine that if the inmate is receiving treatment. But the inmate is receiving treatment in a way which precluded him from determining whether he was being given the right medication or not. And you can say, well, we have to assume he was being given the right medication, but there was an instance when he was not given the right medication. There was an instance, Your Honor, and we acknowledge that. But the concern in this case was that... And doesn't he have the right to know that he's been given the right information, the right medication? I think that was what part of the grievance process was. Right, yeah, and he won. I think he prevailed on that, Your Honor. Yeah. To go back to your answer to my question, which I think was not unreasonable, that while one alternative avenue perhaps open to a prisoner is to go back to the treating physician who originally said do X and prison authorities are now doing Y, wouldn't, as a procedural matter, it be appropriate for the district court to invite, under this circumstance, the prisoner to at least attempt to elicit an affidavit or some testimony from the provider rather than just simply sue a spotty catering summary judgment? I don't know that it's incumbent upon the district court to provide that sort of advice or notice to a litigant. And I understand the pro se status of Mr. Brathwaite and that affords him certain disadvantages. But I don't know that it's the court's responsibility or defense counsel's responsibility to educate the pro se plaintiff to the possible consequences of not retaining an expert. All right. Thank you very much, Mr. Carter. Thank you, Your Honor. Mr. Carter, we'll hear your rebuttal. Thank you, Your Honor. This may please the court. I have one point I'd like to raise about the due process claim and then two about the deliberate indifference claim in my brief time. Counsel for the prison defendant stated that there were no allegations in the complaint about the conditions of Mr. Brathwaite's confinement. But as the benches recognized, Mr. Brathwaite did state that he was locked in the shoe. And because he was acting pro se, because this was on a screening dismissal for frivolousness, each of his allegations should have been read in the light most favorable to him and, importantly, all inferences drawn in his favor. Is there something? Is that all by itself, though, enough, Mr. Kerner? Is it enough to say I was locked in the shoe? That tells you that's an acronym and who knows what it means. And, like, wasn't it incumbent on him to say something more, to say something like, and I'm in here 23 hours, the sorts of things that you've said in your brief which are not in the allegations in the complaint? Yes, that was enough, Your Honor. And, no, I don't believe that more was required. Mr. Brathwaite did spell out what the shoe stood for. I've been using that acronym here today. The court, whether it's... Secured housing unit. How does that tell you what the conditions are? Other than that, it's outside the general population. If a lay person were to pick up the brief, Your Honor, they would not be familiar with the term shoe. But to suggest that the district court is not familiar with the shoe, or given Schultz, Williams, and a bevy of other cases from that district and from around the country, describing the conditions of confinement and administrative segregation, the court was familiar with those conditions. And, at the very least, if it were not, then it should have permitted Mr. Brathwaite the opportunity to re-plead that claim. And is that the right thing here, if we were to agree with you, that he had to have the right to re-plead? I believe the right thing would be to reinstate the complaint, Your Honor, but failing that, then yes, to re-plead. Okay. With respect to Mr. Brathwaite's due process claim, the medical defendants have raised the suggestion that Mr. Brathwaite was competent to proceed with his own claim and to present his own case based on the applications for emergency injunctive relief that he presented and the numerous motions he presented. I believe it's worth noting that of Mr. Brathwaite's five applications for emergency injunctive relief, exactly none were granted, and on appeal each order was affirmed. Mr. Brathwaite's own statements in the district court proceedings, in fact, demonstrate that he fundamentally misunderstood what was happening when the medical defendants and others asked to reopen the proceedings. He stated, and this is on page 12 of our opening brief and pages 392 to 393 of the appendix, that he believed that the medical defendants were attempting to reopen the record to present their own expert testimony. And he stated, quote, the defendants had plenty of time while the request for summary judgments was still pending to amend their request and any information that they now claim to have was available to them prior to the court's decision and could have been obtained by them with due diligence. This is pro forma evidence that Mr. Brathwaite did not understand what was happening and was incapable of representing himself. All right. Thank you very much, Mr. Kerner. And thank you, Mr. Hanlon and Mr. Griffith. We've got the case under advisement. We appreciate counsel's time. And thank you for coming in early so we could handle this today. Court appreciates your indulgence in that. Thank you, Your Honors.